**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SANDRA V. BIESTERFELDT, JOHN W.
BIESTERFELDT, CHRISTINE M. PIPER,
DOUGLAS S. PIPER, WALTER J.
SWINDELL, MARY M. WEBER, and SCOTT
WEBER, on Behalf of Themselves and All
Persons Similarly Situated,

Plaintiffs,

vs.

EPIX PHARMACEUTICALS, INC.,
MICHAEL D. WEBB, PEYTON J.
MARSHALL and ANDREW UPRICHARD,

Defendants.

Civil Action No.

**CLASS ACTION COMPLAINT FOR**
**VIOLATION OF FEDERAL**
**SECURITIES LAWS**

**JURY TRIAL DEMANDED**

RECEIPT #
AMOUNT $ ___
SUMMONS ISSUED ___
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY. CLK. ___
DATE ___

Plaintiffs, by and through their undersigned attorney, bring this action on behalf of

themselves and all others similarly situated, and on personal knowledge as to themselves and

their activities, and on information and belief as to all other matters, based on investigation

conducted by counsel, hereby allege as follows:

1.     This is a class action on behalf of all persons, except defendants, who purchased

or otherwise acquired the publicly traded securities of EPIX Pharmaceuticals, Inc. ("EPIX" or the

"Company"), between July 10, 2003 and January 14, 2005 (the "Class Period") and were

damaged thereby.

2.     EPIX develops pharmaceuticals for imaging used in the diagnosis, treatment and

monitoring of disease.  The Company uses its proprietary Target Visualization Technology(TM)

to create imaging pharmaceuticals targeted at the molecular level, enabling physicians to use

00004290.WPD ; 1

magnetic resonance imaging ("MRI") to obtain detailed information about specific disease processes.

3.    EPIX's principal product in development, MS-325, is designed to provide visual imaging of the vascular system through a type of MRI known as Magnetic Resonance Angiography ("MRA"). MS-325 is being co-developed by EPIX and Schering AG, Germany, the Company's worldwide sales, marketing and development partner.

4.    There are three clinical trial phases in making an investigational drug available for marketing. In Phases I and II, the safety and efficacy of the drug are tested. Phase III clinical trials involve larger numbers of patients and usually last longer than Phase II clinical trials. Typically, if the Phase III clinical trials produce acceptable results, all clinical trial data is examined and included in a New Drug Application submitted to the United States Food and Drug Administration (the "FDA"). If the FDA approves the New Drug Application, the new drug becomes available for physicians to prescribe.

5.    Following clinical trials of MS-325, the Company submitted a New Drug Application for MS-325 to the FDA in December 2003.

6.    However, on or before July 2003, defendants became aware of, but concealed, material problems with the Phase III trials of MS-325, specifically, that the quality of the underlying clinical data was poor and the statistical analysis of that data was flawed. For example, defendants failed to disclose that non-contrast MRA comparator scans used in the Phase III trials varied significantly, and that the Phase III trials generated a large number of uninterpretable images, both of which compromised the efficacy of MS-325. These problems resulted in varying and questionable statistical treatment of the images produced in the Phase III

trials and made FDA approval of the New Drug Application for MS-325 unlikely. Thus, defendants were aware that in order to obtain FDA approval, at a minimum, EPIX would have to conduct additional clinical studies.

7.      Despite their awareness that the clinical trial data submitted by the Company in support of the New Drug Application for MS-325 was insufficient for FDA approval, defendants made materially false and misleading statements throughout the Class Period touting the sufficiency of its clinical trial data and concealing those adverse facts in order to maintain and inflate the price of EPIX stock. For example, an EPIX press released issued on July 10, 2003 stated that "[a]fter recent consultation with the FDA, we continue to believe that our MRA studies in these widely varying vascular areas will support a broad indication for MRA using MS-325."

8.      On January 14, 2005, EPIX received an "approvable" letter from the FDA for MS-325. However, the Company also disclosed that the FDA requested additional clinical studies to demonstrate the efficacy of the drug before FDA approval could be granted. In response to the Company's January 14, 2005 disclosures, the price of EPIX stock plummeted more than 27% to close at $10.67 on extraordinary volume of 11 million shares. Plaintiffs and members of the class purchased EPIX securities during the Class Period at prices artificially inflated by defendants' misrepresentations and were damaged thereby.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R.

§240.10b-5]. Jurisdiction and venue are conferred by §27 of the 1934 Act, 15 U.S.C. §78aa and, 28 U.S.C. §1331.

## PARTIES

10.     Plaintiff Sandra V. Biesterfeldt and John W. Biesterfeldt purchased EPIX securities during the Class Period as detailed in the attached certification and were damaged thereby.

11.     Plaintiffs Christine M. Piper and Douglas S. Piper purchased EPIX securities during the Class Period as detailed in the attached certification and were damaged thereby.

12.     Plaintiff Walter J. Swindell purchased EPIX securities during the Class Period as detailed in the attached certification and was damaged thereby.

13.     Plaintiff Mary M. Weber purchased EPIX securities during the Class Period as detailed in the attached certification and was damaged thereby.

14.     Plaintiff Scott Weber purchased EPIX securities during the Class Period as detailed in the attached certification and was damaged thereby.

15.     Defendant EPIX is a Delaware corporation and maintains its principal place of business at 161 First Street, Cambridge, Massachusetts. The Company develops targeted contrast agents that are designed to improve the diagnostic quality images produced by MRI. EPIX was formerly known as EPIX Medical, Inc.

16.     Defendant Michael D. Webb ("Webb"), at all relevant times, was and is Chief Executive Officer ("CEO") of EPIX. During the Class Period, Webb sold 66,254 shares of his EPIX stock for proceeds of more than $1,205,184.

17.     Defendant Peyton J. Marshall ("Marshall"), at all relevant times, was and is

00004290.WPD ; 1                                    4

Senior Vice President and Chief Financial Officer ("CFO") of EPIX. During the Class Period, Marshall sold 21,500 shares of his EPIX stock for proceeds of more than $372,071.

18.    Defendant Andrew Uprichard ("Uprichard") was, at all relevant times, President and Chief Operating Officer ("COO") of EPIX.

19.    EPIX, Webb, Marshall and Uprichard may be individually referred to herein as "Defendant" or together as "Defendants." Defendants Webb, Marshall and Uprichard may collectively be referred to herein as the "Individual Defendants."

20.    Because of their positions with the Company, the Individual Defendants had access to the Company's files and records, its customers and the adverse undisclosed information about its business, operations, products, operational trends, orders, sales, revenues, financial statements, markets and business prospects via access to internal corporate documents (including the Company's clinical trial data and New Drug Application for MS-325, operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

21.    It is appropriate to treat the Individual Defendants as a group for pleading purposes under the federal securities laws and the Federal Rules of Civil Procedure and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of his high-level position with the Company, directly

5

participated in the management of the Company, was directly involved and/or privy to the day-to-day operations of the Company at the highest levels and had access to confidential proprietary information concerning the Company and its business, operations, products, growth, sales, revenues, earnings, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. Defendants' false and misleading statements and omissions of fact, both on their own and in the aggregate, consequently had the effect of artificially inflating the price of the securities of EPIX at all times during the Class Period.

22.    As officers and controlling persons of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ Exchange and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's orders, sales, revenues, financial condition, performance, growth, operations, financial statements, business, products, markets, management, earnings and business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

23.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various

SEC filings, press releases and other public statements pertaining to the Company during the

Class Period. Each of the Individual Defendants was provided with copies of the publicly

disseminated documents alleged herein to be misleading prior to or shortly after their issuance

and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

Accordingly, each of the Individual Defendants is responsible for the accuracy of the public

reports and releases detailed herein and is therefore primarily liable for the representations

contained therein.

## FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

24.    On July 10, 2003, EPIX issued a press release entitled, "EPIX Announces Results

of Final Phase III Trials of MS-325 for MR Angiography; Renal and Pedal MRA Studies Meet

Primary Endpoints Supporting Broad Vascular Imaging Indication." The press release stated in

relevant part:

> Results from EPIX Medical Inc.'s (Nasdaq: EPIX) final two Phase
> III MS-325 clinical trials in patients with suspected vascular
> disease in the renal and pedal arteries (kidneys and feet) were
> announced today concurrent with the Eleventh Annual Scientific
> Meeting of the International Society of Magnetic Resonance in
> Medicine (ISMRM) in Toronto. Each trial met its primary clinical
> endpoint, demonstrating statistically significant improvement in
> accuracy for detecting renal and pedal vascular disease with MS-
> 325-enhanced magnetic resonance angiography (MRA) compared
> to non-contrast MRA. These final two Phase III studies further
> support results from previous Phase III studies and will form the
> basis for the NDA submission planned for later in the year,
> requesting a broad MRA indication. The company expects MS-
> 325 to be the first contrast agent submitted to the FDA for an MRA
> indication.
>
> "We believe that these latest study results, as part of the complete
> MS-325 Phase III database, will provide a very strong package to
> support the broad use of MS-325 in MRA, which we see as the

next generation of MR contrast," said EPIX CEO Michael D. Webb. "Our NDA submission will include the results from all four Phase III MS-325 clinical trials in patients with suspected vascular disease in the aortoiliac, pedal and renal arteries. After recent consultation with the FDA, we continue to believe that our MRA studies in these widely varying vascular areas will support a broad indication for MRA using MS-325."

"Previous studies with MS-325 support the safety and efficacy of this novel imaging agent in the aortoiliac region, where blood flow can be turbulent. The results of these final two studies confirm the wide range of vascular beds that can be examined using MS-325 MRA," said Gregory Sorensen, M.D., Associate Professor of Radiology at Harvard Medical School and Medical Director for EPIX. Dr. Sorensen further commented, " These Phase III studies show that MS-325 aids the imaging of blood flow to organs such as the kidneys, and areas of slow blood flow such as the feet. The consistency of the results shown in all four Phase III studies has demonstrated that MS-325 should enable physicians to make important decisions about the care of their patients with greater confidence and accuracy."

25.   On December 16, 2003, EPIX issued a press release entitled, " EPIX Submits

MS-325 New Drug Application to FDA; Seeks First U.S. Approval for Magnetic Resonance

Angiography Indication." The press release stated in relevant part:

EPIX Medical, Inc. (NASDAQ: EPIX), a developer of specialty pharmaceuticals for magnetic resonance imaging (MRI), today announced that it has submitted a New Drug Application (NDA) to the Food and Drug Administration (FDA) for MS-325, a contrast agent designed specifically for vascular imaging with magnetic resonance angiography (MRA). MS-325 is being co-developed by EPIX and Schering AG, Germany (NYSE:SHR, FSE:SCH).

EPIX is the first company to seek marketing approval in any country for an MR blood pool agent, a new class of imaging agents expected to expand the clinical use of MRI by providing patients and physicians an innovative means for diagnosing vascular abnormalities. The MS-325 NDA is the culmination of an eight-year MRA development program that was discussed with the FDA

as the trials progressed. It includes the results of 18 clinical trials, involving 1,438 subjects who received MS-325. The MS-325 NDA is the first application for marketing approval for an MR contrast agent to be submitted to the FDA for the primary indication of MRA.

"After extensive scientific and clinical development, we are extremely pleased to announce the submission of the MS-325 NDA to the FDA for a broad vascular imaging indication outside the heart," commented Michael D. Webb, President and CEO of EPIX. "Currently, the standard diagnostic exam for vascular disease is invasive, catheter-based X-ray angiography. We believe MS-325-enhanced-MRA will provide a valuable alternative to X-ray angiography. In addition, there are a significant number of people with vascular disease who, for medical or other reasons, are unlikely to undergo an X-ray angiogram, and who might benefit from a minimally-invasive MRA exam using MS-325."

"An estimated 62 million people in the United States have some form of cardiovascular disease, which can result in atherosclerotic plaque build-up that causes stroke, heart attack, or limb loss," continued Webb. "In 2002, there were 4.8 million diagnostic angiograms performed in arterial beds outside the heart, and an additional 2.7 million diagnostic angiograms of the coronary arteries. As our population ages, cardiovascular disease is putting an increasing burden on our health care system. We believe that MS-325 will address a large and growing medical need, and that both patients and physicians will rapidly adopt this new, less costly procedure."

About MS-325

MS-325 binds reversibly to human serum albumin, brightening the blood for a prolonged period. This feature may allow physicians to collect more meaningful clinical data using widely available MRI equipment to diagnose and characterize vascular disease. MS-325-enhanced MRA is less invasive than current catheter-based X-ray angiography, and has the potential to provide health care professionals with an alternative to diagnose and manage patients with vascular disease.

26.    On February 17, 2004, EPIX issued a press release entitled, "EPIX Announces

FDA Acceptance of Filing of MS-325 NDA; Review of First Drug Developed for MR Vascular

Imaging on Track." The press release stated in relevant part:

> EPIX Medical, Inc. (NASDAQ: EPIX), a developer of
> pharmaceuticals for magnetic resonance imaging (MRI), today
> announced that the U.S. Food and Drug Administration (FDA) has
> determined that the New Drug Application (NDA) submitted for
> MS-325 (gadofosveset) has been accepted for filing by the Agency
> and has been designated for a standard review cycle. Acceptance
> for filing indicates that the FDA considers the NDA to be complete
> and ready for review. The target date for first FDA action in the
> standard review cycle is ten months from the December, 2003 date
> of submission. MS-325, a contrast agent designed specifically for
> vascular imaging with magnetic resonance angiography (MRA), is
> being co-developed by EPIX Medical, Inc. (Nasdaq:EPIX) and
> Schering AG, Germany (NYSE:SHR; FSE:SCH).
>
> "The NDA submission for MS-325 was based on the results of a
> large Phase III clinical trial program that included four separate
> studies. We have been working actively with the FDA, and are
> pleased to move to the next stage of the review process," said
> Michael D. Webb, President and CEO of EPIX. " We believe that,
> if approved, MS-325-enhanced MRA will provide a safer way to
> perform diagnostic angiography. Given the risks that are associated
> with catheter X-ray angiography, many patients are contraindicated
> for either the X-ray contrast agent, or the procedure itself. MS-325
> has the potential to help address this important medical need."

27.     On June 3, 2004, EPIX announced the sale of $100 million in 3.00% convertible

senior notes, resulting in proceeds of approximately $96 million to the Company.

28.     On November 3, 2004, defendants issued a press release entitled, "EPIX

Announces Effectiveness of Registration Statement for Resale of 3.00% Convertible Senior

Notes Due 2024." The press release stated in relevant part:

> EPIX Pharmaceuticals, Inc. (Nasdaq: EPIX), a developer of
> innovative pharmaceuticals for magnetic resonance imaging

(MRI), today announced that the Securities and Exchange
Commission has declared effective its Registration Statement on
Form S-3 relating to the resale of $100 million aggregate principal
amount of its 3.00% convertible senior notes due 2024 (the
"Notes") and the shares of its common stock issuable upon
conversion of the Notes. The Notes were originally issued in a
private placement in June 2004.
EPIX will not receive any proceeds from the sale by any selling
holder of the Notes or the shares of EPIX common stock issuable
upon conversion of the Notes.

## THE TRUTH EMERGES

29.    On January 14, 2005, EPIX issued a press release entitled, "EPIX Pharmaceuticals

Announces Receipt of Approvable Letter from FDA for MS-325; Agency Requests Additional

Clinical Studies." The press release stated in relevant part:

> EPIX Pharmaceuticals, Inc. (Nasdaq: EPIX), announced today that
> the U.S. Food and Drug Administration (FDA) has completed its
> review of the new drug application for MS-325 (gadofosveset
> trisodium), and found it to be approvable. In the approvable letter,
> the FDA requested additional clinical studies to demonstrate
> efficacy prior to approval. MS-325 is the first in a new class of
> MRI blood pool contrast agents, and is specifically designed for
> magnetic resonance angiography (MRA).
>
> The FDA indicated that its principal questions continue to relate to
> the non-contrast MRA comparator scans used in the Phase III trials
> and to the statistical treatment of uninterpretable images. The
> letter identified no safety or manufacturing deficiencies.
>
> EPIX is continuing its active dialogue with the FDA in order to
> determine the next steps the Company will need to take to secure
> the approval of this first-of-its-kind contrast imaging agent. EPIX
> remains committed to developing MRI cardiovascular imaging
> pharmaceuticals that enable clinicians to obtain and view clearer scans.
>
> "The FDA's approvable letter is a significant regulatory milestone,
> although we are disappointed that the Agency has requested
> additional work. We and our partner Schering AG look forward to
> working with the FDA to define the next steps in the approval
> process for MS-325," said Michael D. Webb, Chief Executive

Officer of EPIX.

(Emphasis added.)

30.    Defendants conducted a conference call on January 14, 2005 after the press

release cited above was disseminated.  Defendant Webb, in an attempt to minimize the concerns

raised by the FDA, stated in part:

> I'd like to report on the FDA action letter for MS-325, then I'll
> open up the call for your questions. EPIX has received an action
> letter from the FDA designating MS-325 as approvable, but
> requesting additional clinical studies. The approval of designation
> means that MS-325 can be approved pending resolution of the
> remaining deficiencies identified in the action letter.  There are
> several major findings from the letter we want to summarize and
> share with you.
>
> First, we can report that the FDA has identified no safety
> deficiencies that need to be resolved for approval.  Second, we can
> also report that the FDA has not identified any manufacturing
> deficiencies that need to be resolved before approval.  Third,
> unfortunately the FDA has continued to focus on the efficacy
> questions raised earlier concerning the method of acquiring the
> non-contrast baseline comparative scans and the statistical
> handling of uninterpretable images. The FDA has stated in the
> action letter that resolution their concerns about these issues must
> be achieved before approval can be granted. And the FDA believes
> that resolving these concerns to their satisfaction will require
> additional clinical studies. We are of course disappointed with this
> aspect of the FDA's position in the action letter.
>
> As we mentioned on our conference call in October, FDA had two
> major areas of focus at that time; one, the message for acquiring
> the non-contrast imaging, and two, the statistical handling for
> uninterpretable images.  With respect to the first item, EPIX and
> the FDA agreed prior to the Phase III that the comparator scans for
> the end point for the Phase III trials for the MS-325 would be the
> MRI scanner alone without a contrast agent called device alone
> scanning or non-contrast scanning. This comparator scan is the
> non-contrast MRA or baseline scan.

Since the primary end points of the Phase III trials compared to MS-325 MRA to non-contrast MRA, the quality of the non-contrast MRA scan is important in the agency's consideration of efficacy. The MS-325 Phase III clinical trial protocols required investigators to use their clinical standard of practice methodology for non-contrast MRA, or if they did not had a standard of practice, they were to use the manufacture-specified MRA non-contrast protocols which are included with the MRI scanner previously approved by the FDA.

The FDA is concerned that a standardized non-contrast imaging method was not used at all sites. For the protocol, their institute -- their institutional standard for imaging was employed, sites used different MRI standards and different imaging methods to acquire their non-contrast MRA scans. The agency is concerned that these practice -- these differences in practice between the sites led to variability and non-contrast image quality across the sites.

The agency requested analysis to help us understand whether the specific choice of non-contrast imaging technique affects the results of the Phase III trials. EPIX responded to the FDA with analysis showing the superiority of MS-325 MRA over non-contrast MRA does not fundamentally depend on the choice of the different non-contrast scanning methods. In the action letter, the FDA continued to express its concern that a lack of standardization in the non-contrast imaging procedures may have generated poorer quality non-contrast MRA images than could have been theoretically obtained if the sites had used a uniform standard method.

With respect to the second issue on interpretable scans, the FDA is concerned about what it perceives to be a high rate of uninterpretable non-contrast scans in our pre-specified analysis and that the rate of the uninterpretable scans may have artificially exaggerated the benefit of MS-325. EPIX has provided reanalysis of the Phase III data based on several alternative methods for the statistical handling of the uninterpretable scan in recent submissions to the FDA.

These analyses consistently demonstrate a benefit of MS-325. While we remain convinced of the efficacy of MS-325, unfortunately the agency has requested additional clinical studies to

13

demonstrate the efficacy of the drug. As we have previously reported throughout the MS-325 development program, we have sought and received FDA guidance regarding the appropriate path to approval for a general magnetic resonance angiography label outside of the heart. And ultimately we pursued a Phase III strategy suggested by the agency. We strongly believe in the quality at the MS-325 data and that the comprehensive MS-325 MDA package supports approval.

Despite our history of corporation of the FDA and our responsiveness to the agency's questions throughout the MDA review, they have indicated that they require additional information. Although the specifics of the FDA's requirements won't be known until we've had the opportunity to discuss the issues in detail, any need for a new clinical study will of course result in a significant delay in the approval of MS-325.

Throughout this process our partnership with Schering has been very productive as we have worked together toward MS-325's approval. Although EPIX is the lead partner with respect to the development of MS-325 in the U.S., Schering has been an active contributor to our regulatory responses and we look forward to a continued support as we strive to get MS-325 to market.

In summary, the FDA action letter indicates that additional efficacy data is needed for approval. EPIX is considering all of its options to bring MS-325 to approval as quickly as possible. The first step in this process will be to continue discussions with the FDA in which we hope to establish a framework on how we will address their concerns.

We continue to believe that patients with vascular disease and their physicians need an MRI contrast agent as an alternative to invasive x-ray procedures and we will continue to work to get MS-325 approved.

Now I'd like to open up the call to questions.

OPERATOR: (OPERATOR INSTRUCTIONS) Wade King with Wells Fargo Securities.

WADE KING, ANALYST, WELLS FARGO SECURITIES: Good morning guys, can you hear me?

MIKE WEBB: Good morning, Wade.

WADE KING: Congratulations on the approval notification. Long time seeking that and thanks for the further detail. Could you -- to help put the news into context and to help evaluate what may happen from here in the time line associated with that, could you evaluate the variability in the data to date by the different vascular anatomies associated with the Phase III trials to give us an idea of once you do some additional clinical work and satisfy the FDA's lingering concern, is it possible that the clinical results as it relates to both the standardization of the non-contrast images and dealing with the uninterpretables could ultimately lead you down a path of dating marketing clearance for marketing MS-325 for certain vascular beds? And for example, large vestal vascular beds and the like similar to your original path for approval and possibly not have marketing clearance that acquire additional clinical work associated with other vascular beds? Do you think that remains a possibility? And once again, what in terms of the clinical performance to date in these various three trials -- obviously as there were similar results but not exactly the same, do you think that what I outlined is a possibility based on the path you see ahead?

MIKE WEBB: Of course anything is a possibility at this point. Until we have had more discussions with the FDA we really cannot define the path forward. At this point it's not even possible for us to speculate on broad versus narrow label in terms of the ultimate clinical strategy we will have agreement with the FDA to pursue. That's going to require significant discussions with the FDA to ferret out exactly what we will need to do to meet their requirements. Obviously we believe that MS-325 was very effective in all three vascular beds studied; renal, the pedal and the aortiliac. We had four trials, two in aortiliac, and one in renal and one in pedal. All were extremely successful. All were conducted per prespecified protocol.

WADE KING: Mike, could you give us any idea that management has as it relates to the period of time associated with your further discussion and resolution regarding the timeline of their requirements going forward?

MIKE WEBB: You can be assured that it will be EPIX management and it's also Schering's objective is to make this

> happen as fast as possible. It's impossible to speculate right now as
> to how long it will take us to work through these issues and get it
> resolved. As soon as we have a definitive and clear plan or path
> forward, we will update the market.

(Emphasis added.)

31.    Wells Fargo Securities Analyst Wade King in expressing concern over whether or

not EPIX could realistically accommodate the FDA's timeline:

> WADE KING: Last question, please. To help put it in perspective
> as it relates to the prospect for additional clinical work to satisfy
> their lingering concerns, if you were to prioritize one clinical trial
> looking ahead similar to those which you performed in recent years
> using MS-325 in the various vascular beds, once again there's not
> tremendous time period regarding duration of follow-up in these
> clinical studies. However, to do 200 patients, for example, to get a
> large enough pool for good statistical analysis contrast versus non-
> contrast etc. and then have them -- all the images reviewed by three
> radiologists independently in a blinded manner, the duration of
> time to do that if you prioritize it from a timeline standpoint at
> enrollment is not a lot more than six months. Is that correct? Is it
> possible to do BP trial with what you need to do in terms of
> collating the data following the image review in about six months
> timeline?
>
> MIKE WEBB: I think our history in the four Phase III trials is
> probably what I'd want to comment on which is that we did
> conduct the four Phase III trials. They were relatively large. We do
> have a highly experienced machine here in terms of generating the
> patient enrollment. It takes several months to get a protocol written
> and submitted and approved through IRBs at various sites.
> The Phase III trials we conducted over the last few years, actual
> patient enrollment time was 9 to 12 months per trial from first
> injection to final injection. And then of course the blinded read
> (ph) and the sufficient and rollup of all the data takes many months
> on the back of that. It's difficult to say what the perspective look
> would be because we don't know the size of the trial it will take to
> answer their questions. We don't know exactly what the
> parameters would be that we would be having to power the study
> for. But we will be shooting of course in the discussions to get

something that would meet their requirements and do so definitively.

32.     In short, the deficiencies in the clinical trial data highlighted by the FDA are precisely those problems plaintiffs allege that defendants were aware of, but failed to disclose during the Class Period.  Defendants' statements throughout the Class Period touting the sufficiency of the clinical trial data in support of the New Drug Application for MS-325 were in direct contradiction to the material adverse facts that defendants were aware of from at least July 10, 2003, but failed to disclose during the Class Period: that the clinical trial data and statistical analysis supporting the New Drug Application was insufficient for FDA approval.  In addition, the Company's clinical trial data was inadequate to guide physicians or the FDA panel in the use of MS-325.  Moreover, Defendants failed to disclose, as required by the rules and regulations promulgated by the SEC, including, <u>inter alia</u>, Item 303 of Regulation S-K, 17 C.F.R. §229.303, <u>et seq.</u>, the existence of "known trends or any known demand, commitments, events or uncertainties" at EPIX that would "result in or that are reasonably likely" to have a material impact on the Company's net sales, revenues, income from operations or liquidity.

33.     In response to defendants' January 14, 2005 disclosures, the price of EPIX stock plummeted 27% to $10.67 for a loss of $3.98 per share on extraordinary volume of 11 million shares.  Plaintiffs and the other members of the class, who purchased their EPIX securities during the Class Period at prices artificially inflated by defendants' false and misleading statements, were damaged thereby.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

34.     The market for EPIX securities was open, well-developed and efficient at all

relevant times. As a result of materially false and misleading statements and failures to disclose discussed herein, EPIX securities were purchased and/or acquired and traded at artificially inflated prices during the Class Period. The artificial inflation continued until Defendants disclosed the true financial condition and business prospects for the Company at the end of the Class Period, and this admission was communicated to, and/or digested by, the securities markets. Plaintiffs and the other members of the class purchased or otherwise acquired EPIX securities relying upon the integrity of the market price of EPIX securities and market information relating to the Company, and have been damaged thereby.

35.    At all relevant times, the market for EPIX securities was an efficient market for the following reasons, among others:

a. EPIX stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, EPIX filed periodic public reports with the SEC and NASDAQ;

c. EPIX regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. EPIX was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

36.     As a result of the foregoing, the market for EPIX securities promptly digested current information regarding EPIX from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of EPIX securities during the Class Period suffered similar injury through their purchase of EPIX securities at artificially inflated prices and a presumption of reliance applies.

37.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of EPIX securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary in order to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

38.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint were directly or proximately caused, or were a substantial contributing cause of, the damages sustained by the plaintiffs and the plaintiff class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about EPIX's business, prospects and operations, including the clinical trial data supporting its New Drug Application for MS-325. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of EPIX and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in the plaintiffs and the plaintiff class purchasing the Company's securities at artificially inflated prices, thus causing the damages

complained of herein.

## STATUTORY SAFE HARBOR

39.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of EPIX who knew that those statements were false when made.

## SCIENTER

40.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and, or with reckless disregard, substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of

information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading press releases, SEC filings and communications with analysts and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

41.    During the Class Period, defendants Webb and Marshall also sold large portions of their personal holdings of artificially inflated EPIX stock while in possession of material adverse information about the Company, which further supports a finding that Defendants acted with the requisite scienter:

| Defendant Webb | | | |
|---|---|---|---|
| Date | Sold | Price | Proceeds |
| 09/16/2004 | 1,245 | $21.20 | $26,394 |
| 09/16/2004 | 1,900 | $21.30 | $40,470 |
| 09/16/2004 | 400 | $21.31 | $8,524 |
| 09/16/2004 | 100 | $21.32 | $2,132 |
| 09/16/2004 | 100 | $21.33 | $2,133 |
| 09/16/2004 | 1,032 | $21.35 | $22,033 |
| 09/16/2004 | 223 | $21.40 | $4,772 |
| 09/17/2004 | 2,500 | $20.83 | $52,075 |
| 09/17/2004 | 2,500 | $20.80 | $52,000 |
| 09/21/2004 | 564 | $20.65 | $11,647 |
| 09/23/2004 | 2,500 | $20.20 | $50,500 |
| 09/24/2004 | 978 | $20.25 | $19,805 |
| 09/24/2004 | 338 | $20.16 | $6,814 |
| 09/24/2004 | 1,000 | $20.12 | $20,120 |
| 09/24/2004 | 1,500 | $20.12 | $30,180 |
| 09/24/2004 | 1,526 | $20.35 | $31,054 |
| 09/24/2004 | 1,450 | $20.36 | $29,522 |
| 09/24/2004 | 72 | $20.37 | $1,467 |
| 09/24/2004 | 72 | $20.53 | $1,478 |
| 09/29/2004 | 1,000 | $19.61 | $19,610 |
| 09/30/2004 | 1000 | $19.35 | $19,350 |
| 09/30/2004 | 462 | $19.30 | $8,917 |
| 09/30/2004 | 1,006 | $19.25 | $19,366 |
| 09/30/2004 | 462 | $19.20 | $8,870 |
| 10/01/2004 | 1,000 | $19.16 | $19,160 |
| 10/01/2004 | 1,070 | $19.27 | $20,619 |
| 10/01/2004 | 1,001 | $19.30 | $19,319 |
| 10/01/2004 | 230 | $19.32 | $4,444 |
| 10/01/2004 | 269 | $19.45 | $5,232 |
| 10/04/2004 | 2,500 | $19.85 | $49,625 |
| 10/07/2004 | 2,500 | $17.60 | $44,000 |
| 10/08/2004 | 2,500 | $17.90 | $44,750 |

| Defendant Webb | | | |
|---|---|---|---|
| Date | Sold | Price | Proceeds |
| 10/14/2004 | 1,254 | $16.85 | $21,130 |
| 10/15/2004 | 2,000 | $16.65 | $33,300 |
| 10/21/2004 | 2,160 | $16.25 | $35,100 |
| 10/21/2004 | 340 | $16.25 | $5,525 |
| 10/22/2004 | 2,500 | $16.50 | $41,250 |
| 10/22/2004 | 1,700 | $16.65 | $28,305 |
| 10/22/2004 | 700 | $16.70 | $11,690 |
| 10/22/2004 | 100 | $16.75 | $1,675 |
| 10/28/2004 | 2,500 | $16.10 | $40,250 |
| 10/29/2004 | 1,025 | $15.55 | $15,939 |
| 10/29/2004 | 1,000 | $15.60 | $15,600 |
| 10/29/2004 | 1,000 | $15.59 | $15,590 |
| 10/29/2004 | 500 | $15.58 | $7,790 |
| 10/29/2004 | 100 | $15.63 | $1,563 |
| 10/29/2004 | 1,375 | $15.70 | $21,588 |
| 11/03/2004 | 2,500 | $15.85 | $39,625 |
| 11/03/2004 | 2,500 | $15.75 | $39,375 |
| 11/05/2004 | 1,700 | $16.50 | $28,050 |
| 11/05/2004 | 800 | $16.30 | $13,040 |
| 11/10/2004 | 2,000 | $16.85 | $33,700 |
| 11/12/2004 | 500 | $16.75 | $8,375 |
| 11/12/2004 | 200 | $16.77 | $3,354 |
| 11/12/2004 | 1,000 | $16.85 | $16,850 |
| 11/12/2004 | 1,000 | $16.74 | $16,740 |
| 11/12/2004 | 601 | $16.75 | $10,067 |
| 11/12/2004 | 199 | $16.75 | $3,333 |
| **Totals:** | **66,254** | | **$1,205,184** |

| Defendant Marshall | | | |
|---|---|---|---|
| Date | Sold | Price | Proceeds |
| 10/04/2004 | 1500 | $20.00 | $30,000 |
| 10/07/2004 | 1500 | $17.65 | $26,475 |
| 10/15/2004 | 1500 | $16.62 | $24,930 |
| 10/22/2004 | 1500 | $16.70 | $25,050 |
| 10/29/2004 | 1500 | $15.68 | $23,520 |
| 11/05/2004 | 1200 | $16.65 | $19,980 |
| 11/05/2004 | 200 | $16.67 | $3,334 |
| 11/05/2004 | 100 | $16.66 | $1,666 |
| 11/12/2004 | 1500 | $16.75 | $25,125 |
| 11/17/2004 | 1500 | $17.05 | $25,575 |
| 11/24/2004 | 1500 | $16.00 | $24,000 |
| 11/29/2004 | 1500 | $17.45 | $26,175 |
| 12/10/2004 | 1500 | $17.72 | $26,580 |
| 12/14/2004 | 1500 | $18.05 | $27,075 |
| 12/21/2004 | 1400 | $17.90 | $25,060 |
| 12/21/2004 | 100 | $17.91 | $1,791 |
| 12/28/2004 | 700 | $17.79 | $12,453 |
| 12/28/2004 | 400 | $17.82 | $7,128 |
| 12/28/2004 | 400 | $17.83 | $7,132 |
| 01/03/2005 | 365 | $18.15 | $6,625 |
| 01/03/2005 | 135 | $17.76 | $2,398 |
| **Totals:** | **21,500** | | **$372,071** |

## CLASS ACTION ALLEGATIONS

42.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired EPIX securities from July 10, 2003 through January 14, 2005, inclusive, and who were damaged thereby.  Excluded from the class are Defendants, officers and directors of the Company, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.    During the Class Period, millions of shares of common stock of EPIX were traded on the NASDAQ, an efficient and developed securities market.  Thousands of brokers nationwide have access to trading information about EPIX.

44.    The members of the class are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members of the class.  EPIX has millions of shares of common stock outstanding and is actively traded on the NASDAQ, an efficient market, under the ticker symbol "EPIX."

45.    Plaintiffs' claims are typical of the claims of the members of the class as all members of the class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to those of the class.

47.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by many individual class

members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to individually seek redress for the wrongful conduct alleged herein.

48.     Common questions of law and fact exist as to all members of the class and predominate over any questions affecting solely individual members of the class. Among the questions of law and fact common to the class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether Defendants participated in and pursued the common course of conduct complained of herein;

c.     whether documents, press releases and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented the business condition of EPIX;

d.     whether Defendants failed to correct prior statements when subsequent events rendered those prior statements untrue or inaccurate;

e.     whether Defendants acted willfully or recklessly in misrepresenting and/or omitting to state material facts;

f.     whether the market price of EPIX's common stock during the Class Period was artificially inflated due to the misrepresentations and/or non-disclosures complained of herein; and

g.     whether the members of the class have sustained damages, and, if so, what is the proper measure thereof.

49.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

          a.      Defendants made public misrepresentations or omitted material facts

during the Class Period, as alleged herein;

          b.      the misrepresentations and/or omissions were material;

          c.      EPIX securities were traded in an efficient market;

          d.      the misrepresentations and/or omissions alleged tended to induce

reasonable investors to misjudge the value of EPIX shares; and

          e.      plaintiffs and members of the class acquired their EPIX securities between

the time Defendants made the misrepresentations and/or omissions and the time the truth was

revealed, without knowledge of the falsity of the misrepresentations.

## COUNT I

### (Violations of §10(b) of the Exchange Act
### and Rule 10-5 Promulgated Thereunder Against All Defendants)

50.     Plaintiffs repeat and reallege the allegations above as though fully set forth herein.

51.     During the Class Period, the Defendants, and each of them, carried out a plan,
scheme and course of conduct which was intended to and, throughout the Class Period, did: (i)
deceive the investing public, including plaintiffs and the other class members, as alleged herein;
(ii) artificially inflate and maintain the market price of EPIX securities; and (iii) cause plaintiffs
and other members of the class to purchase EPIX securities at inflated prices. In furtherance of
this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions
set forth herein.

52.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made
untrue statements of material fact and/or omitted to state material facts necessary to make the
statements not misleading; and (c) engaged in acts, practices, and a course of business which
operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to
maintain artificially high market prices for EPIX securities in violation of §10(b) of the Exchange
Act and Rule 10b-5.

53.     The statements made by Defendants during the Class Period were materially false
and misleading because at the time they were made, the Company and persons acting as
corporate officers knew or recklessly ignored, but failed to disclose, the matters set forth herein.

54.     In ignorance of the artificially high market prices of EPIX's publicly traded
securities, and relying directly on Defendants or indirectly on the false and misleading statements
made by Defendants, upon the integrity of the market in which the securities trade, upon the
integrity of the regulatory process, and the truth of representations made to appropriate agencies

throughout the Class Period and/or on the absence of material adverse information that was known to Defendants but not disclosed in public statements by Defendants during the Class Period, plaintiffs and the other members of the class acquired EPIX securities during the Class Period at artificially high prices and were damaged thereby.

55.    Had plaintiffs and the other members of the class and the marketplace known of the true financial condition, business prospects and character of leadership of EPIX which were not

disclosed by Defendants, plaintiffs and other members of the class would not have purchased or otherwise acquired their EPIX securities during the Class Period, or would have not done so at the artificially inflated prices which they paid. Hence, plaintiffs and the class were damaged by Defendants' violations of §10(b) and Rule 10b-5.

## COUNT II

### (Violation of §20(a) of the Exchange Act
### Against the Individual Defendants)

56.    Plaintiffs incorporate by reference the above paragraphs as if set forth fully herein. This Count is asserted against the Individual Defendants.

57.    The Individual Defendants acted as controlling persons of EPIX within the meaning of §20 of the Exchange Act as alleged herein. By reason of their executive, managerial positions with EPIX, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

58.    By reasons of the aforementioned wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, plaintiffs and the other members of the class suffered damages in connection with purchasing the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the

Federal Rules of Civil Procedure;

B.      Awarding damages against Defendants, jointly and severally, as a result of

Defendants' violation of the securities laws;

C.      Awarding the plaintiffs and the class, prejudgment and post-judgment interest, as

well as their reasonable attorneys' and experts' witness fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  March 23, 2005

GILMAN AND PASTOR, LLP

David Pastor (BBO #391000)
Douglas M. Brooks (BBO #058850)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Telephone:     781/231-7850
Facsimile:     781/231-7840

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
Tzivia Brody
6 East 45th Street
New York, NY 10017
Telephone:     212/687-7230
Facsimile:     212/490-2022

*Attorneys for Plaintiffs*

## PLAINTIFF CERTIFICATION

_____ ("Plaintiff") hereby states that:

1.      Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.      Plaintiff did not purchase any common stock/securities of **EPIX Pharmaceuticals, Inc.** at the direction of his/her counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      The following includes all of Plaintiff's transactions in **EPIX Pharmaceuticals, Inc.** common stock/securities during the class period specified in the complaint:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| Common Stock | Purchase | 7-14-03 | 18.04 | 100 |
|  |  |  |  |  |
|  |  |  |  |  |

**Please list other transactions on a separate sheet of paper, if necessary.**

5.      Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:


6.      Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this _16th_ day of _March_____, 2005.


_____
Signature

Sandra A. Busterfield

# PLAINTIFF CERTIFICATION

*Douglas S. Piper*
*Christine M. Piper* ("Plaintiff") hereby states that:

1.    Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.    Plaintiff did not purchase any common stock/securities of **EPIX Pharmaceuticals, Inc.** at the direction of his/her counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The following includes all of Plaintiff's transactions in **EPIX Pharmaceuticals, Inc.** common stock/securities during the class period specified in the complaint:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| Stock | Purchase | 2/23/04 | 20.939 | 185 |
| Stock | Purchase | 10/27/04 | 16.52 | 400 |
| Stock | Purchase | 1/21/05 | 10.829 | 215 |
|  |  |  |  |  |

**Please list other transactions on a separate sheet of paper, if necessary.**

5.    Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this ___18___ day of ___March___, 2005.

_____
Signature

## PLAINTIFF CERTIFICATION

_____ ("Plaintiff") hereby states that:

1.    Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.    Plaintiff did not purchase any common stock/securities of **EPIX Pharmaceuticals, Inc.** at the direction of his/her counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The following includes all of Plaintiff's transactions in **EPIX Pharmaceuticals, Inc.** common stock/securities during the class period specified in the complaint:

| SECURITY<br>(Common Stock, Call, Put, Bonds) | TRANSACTION<br>(Purchase, Sale) | TRADE DATE | PRICE PER<br>SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| Epix Med, Inc | | 5-04-04 | 26,003,73<br>25.54 | 1000 |
| " " " | | 8-04-04 | 17,300<br>17.30 | 1000 |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

5.    Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this __17__ day of ___March___, 2005.

_Walter J Swindell_
_____
Signature

## PLAINTIFF CERTIFICATION

_Mary M Weber_ ("Plaintiff") hereby states that:

1.    Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.    Plaintiff did not purchase any common stock/securities of **EPIX Pharmaceuticals, Inc.** at the direction of his/her counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The following includes all of Plaintiff's transactions in **EPIX Pharmaceuticals, Inc.** common stock/securities during the class period specified in the complaint:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| EPIX | 5-10-04 | 5-13-04 | 22.8090 | 190 |
| | | | | |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

5.    Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this ___16___ day of ___March___, 2005.

_Mary M Weber_
Signature

## PLAINTIFF CERTIFICATION

_Scott Webel_ ("Plaintiff") hereby states that:

1.    Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.    Plaintiff did not purchase any common stock/securities of **EPIX Pharmaceuticals, Inc.** at the direction of his/her counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The following includes all of Plaintiff's transactions in **EPIX Pharmaceuticals, Inc.** common stock/securities during the class period specified in the complaint:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| Epix Medica Inc | 5-10-04 | 5-13-04 | 22.7990 | 160 |
| | | | | |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

5.    Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this ___16___ day of __March__ , 2005.

_Scott Webel_
**Signature**

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Sandra V. Biesterfeld, John W. Biesterfeld, Christine M. Piper, Douglas S. Piper, Walter J. Swindell, Mary M. Weber, and Scott Weber, on Behalf of Themselves and All Persons Similarly Situated

## DEFENDANTS

EPIX Pharmaceuticals, Inc., Michael D. Webb, Peyton J. Marshall and Andrew Uprichard

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF　Cook (IL)
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:　IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Douglas M. Brooks, Gilman and Pastor, LLP
999 Broadway, Suite 500
Saugus, MA 01906
(781) 231-7850

ATTORNEYS (IF KNOWN)

05　10559　PBS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Action for securities fraud under 15 U.S.C. § 78j(b).

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE　Saris

DOCKET NUMBER　05-10166-PBS

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Sandra V. Biesterfeldt, et al. v.
EPIX Pharmaceuticals, Inc.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

[ ]   I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

[X]   II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
            740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.      for patent, trademark or copyright cases

[ ]   III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
            315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
            380, 385, 450, 891.

[ ]   IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
            690, 810, 861-865, 870, 871, 875, 900.

[ ]   V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

H.D. Yorston v. EPIX Pharmaceuticals, Inc., 05-cv-10166-PBS

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ]    NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES [ ]    NO [X]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ]    NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [ ]    NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [X]    NO [ ]

A.    If yes, in which division do all of the non-governmental parties reside?

Eastern Division [X]    Central Division [ ]    Western Division [ ]

B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [ ]    Central Division [ ]    Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME Douglas M. Brooks, Gilman and Pastor, LLP
ADDRESS 999 Broadway, Suite 500, Saugus, MA 01906
TELEPHONE NO. 781-231-7850

(Coversheetlocal.wpd - 10/17/02)